# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE PHOENIX INSURANCE COMPANY,**<br>    **Plaintiff and Defendant-in-Counterclaim,**<br><br>v.<br><br>**RAGNAR BENSON CONSTRUCTION LLC.,**<br>    **Defendant and Plaintiff-in-Counterclaim, and**<br>**CSX INTERMODAL TERMINALS, INC. and**<br>**LOGISTICS CONCRETE LLC,**<br>    **Defendants.** | )<br>)<br>)<br>)<br>)      **C.A. NO. 18-11687-TSH**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF DECISION AND ORDER
### September 10, 2019

**HILLMAN, D.J.**

## Introduction

Plaintiff/Defendant-in-Counterclaim, The Phoenix Insurance Company ("Phoenix"), has

brought an action seeking a declaration that it owes no coverage obligations. defense, or

indemnity, in connection with a construction dispute involving its insured Logistics Concrete,

LLC ("Logistics"), Ragnar Benson, LLC ("Ragnar") and CSX Intermodal Terminals, Inc.

("CSX").[1] Ragnar has filed a counterclaim against Phoenix seeking a declaration that Phoenix

---

[1] Phoenix's original complaint also named Gallagher Asphalt Company ("Gallagher") as a party, however, Phoenix's amended complaint replaced Gallagher with Logistics. Logistics is an affiliate of Gallagher.

has an obligation to defend and indemnify Ragnar in connection with the arbitration of the underlying dispute with CSX.

This dispute involves insurance coverage available to Ragnar as an additional insured on a policy of commercial general liability insurance Phoenix issued to Ragnar's subcontractor, Logistics as "Named Insureds." Ragnar and Logistics were named in an arbitration brought in Florida by CSX, the owner of a project on which they worked— an intermodal terminal in Worcester, Massachusetts. CSX contends that certain pavement work was defective. Phoenix declined to defend Ragnar and Logistics in the arbitration, arguing that CSX does not seek "property damage" as a result of an "occurrence," which is required to trigger coverage under the Policy's insuring agreement. Phoenix also argues that four policy exclusions apply.

In its counterclaim, Ragnar asserts that Phoenix owes it a defense because the arbitration pleadings establish that CSX is seeking to recover for damage to other contractor's work caused by Logistics, as well as for damage to CSX's equipment. Ragnar argues that such "property damage" is within the insurance policies' coverage and not excluded. Ragnar and Logistics also assert that there is coverage under the "insured contract" provisions of the insurance policies issued by Phoenix, which Phoenix also disputes.

This Memorandum of Decision and Order addresses the Motion for Partial Summary Judgment of Ragnar Benson Construction, LLC and Request For Hearing (Docket No. 21), Plaintiff's Cross Motion For Summary Judgment Against Ragnar Benson Construction LLC (Motion 35) and the Motion for Partial Summary Judgement of Logistics Concrete, LLC (Docket No. 55). For the reasons set forth below, Ragnar's and Logistics' motions are *granted* and Phoenix's motion is *denied*.

**Facts**

**The Project and CSX's Claims**

In 2010, CSX undertook the reconstruction and expansion of its rail and trucking intermodal in Worcester, Massachusetts (the "Project").   CSX has a principal place of business in Jacksonville, Florida. CSX entered into a contract (the "Prime Contract")[2] with Ragnar for the Project work. CSX specified the use of "roller compacted concrete" ("RCC") for the paving work. Ragnar hired Logistics as the RCC subcontractor. Logistics has a principal place of business in Joliet, Illinois. Logistics and Gallagher have operations in many states. The Prime Contract provided that any arbitration proceedings regarding disputes thereunder would be held in Duval Count, Florida unless another location was mutually agreed upon.

On March 16, 2012, Ragnar and Logistics entered into a subcontract ("Subcontract"). The Subcontract stated that the "Subcontract Work" required of Logistics was "[t]o provide all labor, material, equipment, tools, supervision and insurance necessary to perform Roller Compacted Concrete Paving Work" in accordance with specific plans and requirements. Paragraph 3(a) of the Subcontract, "Indemnification" stated, in pertinent part:

> [t]o the fullest extent permitted by law, the Subcontractor [Logistics] shall indemnify and hold harmless the Contractor [Ragnar], the Owner, and their respective officers, directors, agents, and employees from and against any and all loss, liability, damages, costs, attorneys fees, investigative costs, or other expenses of any kind (all of which are collectively referred to as 'Costs'), arising in connection with … (ii) any claim or claims for injuries, for loss or damage to or destruction of property, real or personal, including loss of use, which arise out of
> the Subcontract Work or the actions of any Subcontractor Party ….

---

[2] The Prime Contract was a two-part agreement; the first part was entered into between Ragnar and CSX on December 8, 2010 and the second was entered into on March 31, 2011.

Paragraph 4 of the Subcontract, "Insurance" required Logistics to obtain and maintain specific insurance coverage as set forth therein and required it to name "Ragnar Construction, LLC, [and] CSX Intermodal Terminals, Inc., 301 W. Bay Street, Jacksonville, FL, CSX Transportation, Inc … on a basis specific to the Project, as additional insureds under their Commercial General, Automobile & Umbrella/Excess liability policies."   The Subcontract further required that arbitration proceedings be held in Duval County, Florida unless another location was mutually agreed upon.

On May 15, 2018, CSX filed a Demand for Arbitration ("CSX Arbitration") with the American Arbitration Association ("AAA") in Jacksonville, Florida, against Ragnar. On September 4, 2018, CSX submitted its Statement of Claim in the arbitration proceedings for damages of more than Fourteen Million Dollars ($14,000,000). In the Statement of Claim, CSX complained of the following deficiencies in the RCC used at the Project: "(A) structural failures at the craneways; (B) raveling at the paving joints; and (C) potholing and surface deterioration of the pavement." CSX attributed those deficiencies to Ragnar's failure to perform its work at the Project appropriately in various ways. With respect to the structural failures at the craneways, CSX alleged that: "The deterioration in the craneways and the lack of bonding allows water intrusion. This water intrusion, combined with seasonal cycles, will result in continuing damage to the underlying sub-base and subgrade. In addition, operating the cranes over damaged RCC can cause damage to the cranes and potentially other equipment."

 With respect to the potholing and RCC surface deterioration, CSX alleged that: "If the RCC is not corrected, its deterioration will lead to water intrusion and destruction of the underlying sub-base and subgrade layers. In addition, operating equipment over deteriorating

RCC leads to further damage or destruction."   With respect to the vertical joint raveling, CSX alleged that: "joint failures have resulted in additional damage to CSX. Testing conducted both during and post-construction evidenced the strength of the soil fill layer beneath the concrete, but since the concrete deterioration has increased in magnitude the cracks have allowed water intrusion into the subgrade below the pavement, as well as between the pavement lifts, resulting in additional damage which will necessitate repairs." CSX further alleged that "[d]eterioration continues to occur" and that its "damages continue to increase."

Although not in its Statement of Claim, CSX also alleges that cranes have been damaged due to problems with the RCC. CSX attributes the deficiencies and damages to Ragnar's failure to perform its work at the Project appropriately in various respects.

On May 15, 2018, Ragnar filed a Demand for Arbitration ("Ragnar Arbitration") against Logistics with the AAA. The CSX Arbitration and the Ragnar Arbitration have been consolidated and will hereafter be referred to collectively as the "Project Arbitration."   On August 31, 2018, Ragnar filed its Statement of Claim against Logistics in which it alleged that the work of Logistics was deficient with respect to its: (1) design of the RCC mix; (2) compaction of the RCC at its installation locations; (3) bonding of the multi-lift placements; and (4) connection of vertical joints. In its Statement of Claim, Ragnar stated that as a result of Logistics Concrete's deficiencies: "CSX alleges damages for the cracking and joint deterioration in the RCC pavement as well as derivative damage to other work performed by other contractors on the Project, i.e., the sub-base."   Ragnar further asserted that "CSX claims that demolition of the RCC layers, removal and replacement of the sub-base and reinstallation of PCC (instead of

RCC) is required." Ragnar noted that the sub-base was not within the scope of Logistics' work. Ragnar also stated that CSX had suffered damage because "cracked, shattered and missing RCC was in the wheel path of the RTG cranes and other wheeled traffic."

<u>The Insurance Policies and Demands for Coverage/Defense</u>

Phoenix, which has a principal place of business in Hartford, Connecticut, issued a policy numbered DT-CO-6B52655-PHX-12 to Gallagher, as named insured, for the policy period May 1, 2012, to May 1, 2013 ("2012-13 Phoenix Policy"), which provides coverage of $1,000,000 per occurrence, $2,000,000 products-completed operations aggregate and $2,000,000 general aggregate.   Phoenix also issued a policy numbered DT-CO-6B52655-PHX-13 to Gallagher, as named insured, for the policy period May 1, 2013, to May 1, 2014 ("2013-14 Phoenix Policy"), which provides coverage of $1,000,000 per occurrence, $2,000,000 products-completed operations aggregate and $2,000,000 general aggregate. Finally, Phoenix issued a policy numbered DT-CO-6B52655-PHX-14 to Gallagher, as named insured, for the policy period May 1, 2014, to May 1, 2015 ("2014-15 Phoenix Policy," and together with the 2012-13 Phoenix Policy and 2013-14 Phoenix Policy, the "Phoenix Policies"),

All three of the Phoenix Policies' "Common Policy Declarations" identify "Gallagher Asphalt Corporation 18100 S. Indiana Ave. Thornton, IL 60476" as the "Named Insured."   All three of the Phoenix Policies contain a General Purpose Endorsement, which states in pertinent part:

Item 1 Named Insured to read:

Gallagher Asphalt Corporation
….

Logistics

6

The 2012-13 Phoenix Policy includes a "Blanket Additional Insured (Contractors)" form (CG D2 46 08 05) which states (in relevant part):

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

WHO IS AN INSURED -- (Section II) is amended to include any person or organization that you agree in a "written contract requiring insurance" to include as an additional insured on this Coverage Part, but:
a) Only with respect to liability for . . . "property damage" . . . and

b) if, and only to the extent that, the injury or damage is caused by the acts or omissions or you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies. The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

….

5. The following is added to the DEFINITIONS Section:

"Written contract requiring insurance" means that part of any written contract or agreement under which you are required to include a person or organization as an additional insured on this Coverage Part, provided that the . . . "property damage" occurs:

a. After the signing and execution of the contract or agreement by you;

b. While that part of the contract or agreement is in effect; and

c. Before the end of the policy period.

The 2012-13 Phoenix Policy also contains an Additional Insured endorsement which states in full as follows:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTOR SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
SCHEDULE

NAME OF PERSON OR ORGANIZATION:
ANY PERSON OR ORGANIZATION THAT YOU AGREE IN A
WRITTEN CONTRACT TO INCLUDE AS AN ADDITIONAL
INSURED ON THIS COVERAGE PART, PROVIDED THAT THE
WRITTEN CONTRACT:

    1.    SPECIFICALLY REQUIRES YOU TO USE ISO
        COVERAGE FORM CG 20 10 10 01 TO INCLUDE
        SUCH PERSON OR ORGANIZATION AS
        ADDITIONAL INSURED.

    2.    IS IN EFFECT WHEN, THE "BODILY INJURY" OR
        "PROPERTY DAMAGE" OCCURS OR THE "
        PERSONAL INJURY" OR "ADVERTISING INJURY"
        OFFENSE IS COMMITTED.

The 2012-13 Phoenix Policy also contains an Additional Insured endorsement which

states in full as follows:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT
CAREFULLY

ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTOR

COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

NAME OF PERSON OR ORGANIZATION:

ANY PERSON OR ORGANIZATION THAT YOU AGREE IN A
WRITTEN CONTRACT TO INCLUDE AS AN ADDITIONAL
INSURED ON THIS COVERAGE PART, PROVIDED THAT THE
WRITTEN CONTRACT:

1.      SPECIFICALLY REQUIRES YOU TO USE ISO
        COVERAGE FORM CG D3 73 11 05 TO INCLUDE
        SUCH PERSON OR ORGANIZATION AS
        ADDITIONAL INSURED.

2.       IS IN EFFECT WHEN, THE "BODILY INJURY" OR
        "PROPERTY DAMAGE" OCCURS OR THE
        "PERSONAL INJURY" OR "ADVERTISING INJURY"
        OFFENSE IS COMMITTED.

LOCATION AND DESCRIPTION OF COMPLETED OPERATIONS:

ALL PROJECTS WHERE REQUIRED TO PROVIDE COVERAGE AS
DESCRIBED IN THE ABOVE SCHEDULE.

The 2013-14 Phoenix Policy contains an Additional Insured endorsement which states in

full as follows:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT
CAREFULLY.

ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTOR
SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

NAME OF PERSON OR ORGANIZATION:

ANY PERSON OR ORGANIZATION THAT YOU AGREE IN A
WRITTEN CONTRACT TO INCLUDE AS AN ADDITIONAL
INSURED ON THIS COVERAGE PART, PROVIDED THAT THE
WRITTEN CONTRACT:

1.      SPECIFICALLY REQUIRES YOU TO USE ISO
        COVERAGE FORM CG 20 10 10 01 TO INCLUDE
        SUCH PERSON OR ORGANIZATION AS
        ADDITIONAL INSURED.

2.      IS IN EFFECT WHEN, THE "BODILY INJURY" OR

9

> "PROPERTY DAMAGE" OCCURS OR THE
> "PERSONAL INJURY" OR "ADVERTISING INJURY"
> OFFENSE IS COMMITTED.

The 2013-14 Phoenix Policy contains an Additional Insured endorsement which states in full as follows:

> THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
>
> ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTOR COMPLETED OPERATIONS
>
> This endorsement modifies insurance provided under the following:
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
>
> SCHEDULE
>
> NAME OF PERSON OR ORGANIZATION:
>
> ANY PERSON OR ORGANIZATION THAT YOU AGREE IN A WRITTEN CONTRACT TO INCLUDE AS AN ADDITIONAL INSURED ON THIS COVE RAGE PART, PROVIDED THAT THE WRITTEN CONTRACT:
>
> > 1.    SPECIFICALLY REQUIRES YOU TO USE ISO COVERAGE FORM CG D3 73 11 05 TO INCLUDE SUCH PERSON OR ORGANIZATION AS ADDITIONAL INSURED.
> >
> > 2.    IS IN EFFECT WHEN, THE "BODILY INJURY" OR "PROPERTY DAMAGE" OCCURS OR THE "PERSONAL INJURY" OR "ADVERTISING INJURY" OFFENSE IS COMMITTED.
>
> LOCATION AND DESCRIPTION OF COMPLETED OPERATIONS:
>
> ALL PROJECTS WHERE REQUIRED TO PROVIDE COVERAGE AS DESCRIBED IN THE ABOVE SCHEDULE.

The 2014-15 Phoenix Policy contains an Additional Insured endorsement which states in full as follows:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTOR

COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

NAME OF PERSON OR ORGANIZATION:

ANY PERSON OR ORGANIZATION THAT YOU AGREE IN A WRITTEN CONTRACT TO INCLUDE AS AN ADDITIONAL INSURED ON THIS COVERAGE PART, PROVIDED THAT THE WRITTEN CONTRACT:

    1.    SPECIFICALLY REQUIRES YOU TO USE ISO COVERAGE FORM CG 20 37 07 04, OR EQUIVALENT, TO INCLUDE SUCH PERSON OR ORGANIZATION AS ADDITIONAL INSURED.

    2.    IS IN EFFECT WHEN, THE "BODILY INJURY" OR "PROPERTY DAMAGE" OCCURS OR THE "PERSONAL INJURY" OR "ADVERTISING INJURY" OFFENSE IS COMMITTED.

LOCATION AND DESCRIPTION OF COMPLETED OPERATIONS:

ALL PROJECTS WHERE REQUIRED TO PROVIDE COVERAGE AS DESCRIBED IN THE ABOVE SCHEDULE

All three Phoenix Policies include a "Commercial General Liability Coverage Form.". The Phoenix Policies' Insuring Agreement states in part as follows:

SECTION I – COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally
obligated to pay as damages because of . . . "property
damage" to which this insurance applies. We will have the
right and duty to defend the insured against any "suit"
seeking those damages. However, we will have no duty to
defend the insured against any suit seeking damages for . . .
"property damage" to which this insurance does not
Apply …
….

b. This insurance applies to . . . "property damage" only if:

> (1) The . . . "property damage" is caused by an
> "occurrence" that takes place in the "coverage
> territory";
>
> [and]
> (2) The …   "property damage" occurs during the policy
> period …

….

The Phoenix Policies defines "occurrence" to mean "an accident, including continuous or

repeated exposure to substantially the same general harmful conditions. The Phoenix Policies

defines "property damage" as follows:

> … "Property damage" means:

> a. Physical injury to tangible property, including all resulting
> loss of use of that property. All such loss of use shall be
> deemed to occur at the time of the physical injury that caused it; or

> b. Loss of use of tangible property that is not physically
> injured. All such loss of use shall be deemed to occur at the
> time of the "occurrence" that caused it.

The Phoenix Policies define "suit" to mean "a civil proceeding in which damages

because of . . ."property damage" . . . are alleged and includes: … "An arbitration proceeding in

which such damages are claimed and to which the insured must submit or does submit with our consent . . ."

Coverage A of the 2013-14 and 2014-15 Phoenix Policies contains the following exclusion b. for "Contractual Liability"[3]:

2.      Exclusions

This insurance does not apply to:

….

b.      Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

---

3   The 2012-13 Phoenix Policy contains this exclusion but it was amended slightly be endorsement.

Paragraph f. of the definition of "Insured Contract" in the Phoenix Policies includes

within that definition:

> That part of any other contract or agreement pertaining to your business
> (including an indemnification of a municipality in connection with work
> performed for a municipality) under which you assume the tort liability of
> another party to pay for "bodily injury" or "property damage" to a third
> person or organization. Tort liability means a liability that would be
> imposed by law in the absence of any contract or agreement.

Coverage A of the Phoenix Policies contains the following exclusions j.(5) and

j.(6) for "Damage to Property":

> 2. Exclusions
>
> This insurance does not apply to:
> ….
>
> j. Damage to Property
>
> "Property damage" to:
>  ….
>
> (5) That particular part of real property on which you or
> any contractors or subcontractors working directly
> or indirectly on your behalf are performing
> operations, if the "property damage" arises out of
> those operations; or
>
> (6) That particular part of any property must be restored,
> repaired or replaced because "your work" was incorrectly performed on it.
>
> ….
>
> Paragraph (6) of this exclusion does not apply to "property
> damage" included in the "products-completed operations
> hazard".

The Phoenix Policies define "Your Work" as follows:

> … Your work":
>
> a. Means:

(1) Work or operations performed by you or on your
behalf; and

(2) Materials, parts or equipment furnished in
connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with
respect to the fitness, quality, durability,
performance or use of "your work", and

(2) The providing of or failure to provide warnings or
instructions.

The Phoenix Policies define "Products-completed operations hazard" in part as

follows:

  … "Products-completed operations hazard":

a. Includes all . . . "property damage" occurring away from
premises you own or rent and arising out of "your product"
or "your work" except:
….

      (2) Work that has not been completed or abandoned.
      However "your work" will be deemed completed at
      the earliest of the following times:

      (a) When all of the work called for in your
      contract has been completed.
      ….

      (b) When that part of the work done at a job site
      has been put to its intended use by any
      person or organization other than another
      contractor or subcontractor working on the
      same project.

Work that may need service, maintenance,
correction, repair or replacement, but which is
otherwise complete, will be treated as completed.

Coverage A of the Phoenix Policies contains the following exclusion k. for

"Damage to Your Product":

2. Exclusions

This insurance does not apply to:

….

k. Damage to Your Product

"Property damage" to "your product" arising out of it or
any part of it.

The Phoenix Policies define the term "Your Product" in part as follows:

… "Your product":

a. Means:

    (1) Any goods or products, other than real property,
    manufactured, sold, handled, disturbed or disposed
    of by:

(a) You;

….

b. Includes:

    (1) Warranties or representations made at any time with
    respect to the fitness, quality, durability,
    performance or use of 'your product" . . . .

Coverage A of the Phoenix Policies contains the following exclusion l. for

"Damage to Your Work":

2. Exclusions
This insurance does not apply to:
….

l. Damage to Your Work
"Property damage" to "your work" arising out of it or any

16

part of it and included in the "product-completed operations
hazard".

This exclusion does not apply of the damaged work or the
work out of which the damage arises was performed on
your behalf by a subcontractor.

Logistics sent Phoenix a notice of the Project Arbitration and has requested that Phoenix

provide it and Ragnar with a defense under the Phoenix Policies. Ragnar also demanded a

defense from Phoenix under the Phoenix Policies. Phoenix has declined to defend Logistics and

Ragnar in the Project Arbitration.

## Discussion

### Standard of Review

### *Summary Judgment*

Summary Judgment is appropriate where, "the pleadings, depositions, answers to

interrogatories and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)).

"A genuine issue is one that could be resolved in favor of either party, and a material fact is one

that has the potential of affecting the outcome of the case.'" *Sensing v. Outback Steakhouse of*

*Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*,

355 F.3d 6, 19 (1st Cir. 2004) (internal citation and quotation marks omitted).

The moving party bears the burden to demonstrate the absence of a genuine issue of

material fact within the record. *Sensing*, 575 F.3d at 153. "Once the moving party has pointed

to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party

must come forward with facts that show a genuine issue for trial." *Id.* (citing *Carroll*, 294 F.3d

at 236).   These facts must not be merely allegations or denials of the moving party's pleadings.

*Id.*   Both "[c]onclusory allegations [and] improbable inferences" are insufficient to overcome

summary judgment.   *Sensing*, 575 F.3d at 153 (citing *Carroll*, 294 F. 3d at 236-37 (internal

quotations omitted).   "The test is whether, as to each essential element, there is 'sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Sensing* 575

F.3d at 153 (citations omitted). "Cross-motions for summary judgment require the district court

to 'consider each motion separately, drawing all inferences in favor of each non-moving party in

turn.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to

quoted case omitted).

<u>Choice of Law</u>

Ragnar argues that Florida law should apply to determine whether Phoenix has an

obligation to defend it in the Project Arbitration proceedings. In support of its argument, Ragnar

cites to the fact that either Florida or Massachusetts law applies: Florida, because CSX is based

in Florida and the Prime Contract requires the Project Arbitration to take place in Florida or

Massachusetts because the Project was located in Massachusetts. Phoenix argues that either

Illinois or Massachusetts law should apply: Illinois because that is where Logistics, the insured,

has its principle place of business, or Massachusetts because the Project was located in

Massachusetts. Phoenix further argues that since the law of Massachusetts and Illinois are the

same on the relevant issues, the Court may apply either law. Logistics argues that either Illinois

or Massachusetts law applies and to the extent that the Court finds a conflict between the two

states laws, Massachusetts choice of law rules require the Court to apply Illinois law.

The Court applies Massachusetts choice of law principles to determine which state's law apply.

> The Massachusetts Supreme Judicial Court has decided 'not to tie Massachusetts conflicts law to any specific choice-of-law doctrine, but seek[s] instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole,' and looks to the Restatement (Second) of Conflict of Laws (1971) as an 'obvious source of guidance.' As to contract interpretation, § 188(1) of the Restatement states that '[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties.' Following that guidance, the Supreme Judicial Court has held specifically that whether an insurer has a duty to indemnify a claim under an insurance policy 'should not depend on the law of the jurisdiction governing that particular claim but rather should be determined by the law governing the interpretation of the insurance policy and its issuance.'

*Fire Ins. Exch. v. Pring-Wilson*, 778 F. Supp. 2d 116, 125 (D. Mass. 2011)(internal citations and citation to quoted cases omitted).

> In evaluating that relationship, the contacts to be taken into account ... include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. However, the determination as to which state has the most significant relationship is not reached by "simply adding up various contacts." Instead, the court should consider those contacts in light of the following factors relevant to the choice-of-law analysis:
>
> > (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectation, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Mead Johnson & Co.*, No. CIV.A. 11-10042-NMG, 2011 WL 6148656, at *13–14 (D. Mass. Dec. 8, 2011).

> Section 193 [of the Restatement] provides that the rights created by a contract of casualty insurance are to be determined by the local law of the State that the parties to the insurance contract understood would be the principal location of the insured risk during the term of the policy, unless some other State has a more significant relationship under the principles of § 6. Section 193 further provides that [t]he location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state." Restatement § 193 comment b. The insured risk generally will be located in the State where the policy holder is domiciled.

*OneBeacon Am. Ins. Co. v. Narragansett Elec. Co.*, 90 Mass. App. Ct. 123, 125, 57 N.E.3d 18, 20–21 (2016).   Moreover, "while an underlying tort claim might properly be resolved under the laws of the State where the injury occurred, the obligation of an insurer to defend and indemnify against that claim is more appropriately determined by reference to the insurance contract itself and the circumstances of its issuance." *Id.*, at 126–27, 57 N.E.3d at 21.

Before undertaking the choice of law analysis, "[h]owever, '[t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions.'   The First Circuit has repeatedly explained that when 'the outcome is the same under the substantive law of either jurisdiction,' there is no actual conflict and a court 'need not resolve the [choice-of-law] issue.'" *State Farm Fire & Cas. Co. v. Pike*, 389 F. Supp.3d 94 (D. Mass. 2019)(citation to quoted case omitted) [4].

---

[4] In determining which state's law applies, I will limit my focus to Illinois and Massachusetts. Ragnar argues that Florida law applies, however, the only contacts this case has to Florida is that CSX has a principle place of business there and the Prime Contract has a forum selection clause requiring that any arbitration thereunder take place in Florida. These minimal contacts, which have no relation to the Phoenix Policies, the location of the Project or the underlying claims, are clearly insufficient to make Florida law applicable in this case.   That being said, there is no discernable difference between Massachusetts, Florida and Illinois law in determining the duty to defend.

*Determining the Duty to Defend*

Under Massachusetts law, an insurer has a duty to defend when the allegations of the complaint are "reasonably susceptible" of an interpretation that "roughly sketches a claim covered by the policy terms." *Billings v. Commerce Ins. Co.*, 458 Mass. 194, 936 N.E.2d 408, 414 (2010).   "'In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage.'" *Id.* (citation to quoted case omitted). The scope of an insurer's duty to defend is "based not only on the facts alleged in the complaint but also on the facts that are known or readily knowable by the insurer." *Manganella v. Evanston Ins. Co.*, 746 F. Supp. 2d 338, 345 (D. Mass. 2010), *aff'd*, 700 F.3d 585 (1st Cir. 2012)(citation to quoted case omitted).   "However, when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the claimant." *Billings*, 458 Mass at 194, 936. N.E.2d at 414 (internal quotations omitted).

> 'Where an insured is covered as an additional insured, the complaint is properly matched to the additional insured provision to determine the potential for coverage … The burden[] of persuasion begin with the obligation of the insured party to prove coverage and then may shift to the insurer to prove that an exclusion applies.' Once the insured party's ultimate burden regarding coverage is satisfied with regard to at least one claim against the insured, the insurer has a duty to defend generally. Taken together, these legal propositions mean that if [the claimant] shows that the allegations against it could give rise to a covered claim and if [the insurer] cannot show that such a claim would be expressly excluded, then [the insurer] owes [the claimant] a full defense.

*Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 152 F. Supp. 3d 15, 20 (D.Mass. 2015).

Under Illinois law, "'an insurer's duty to defend is 'much broader' than its duty to indemnify.' 'A duty to defend will arise when the allegations of the underlying complaint may potentially come within the coverage of the policy.' The insurer may not simply refuse to defend

a suit against its insured unless it is clear from the underlying complaint 'that the allegations fail

to state facts which bring the case within, or potentially within, the policy's coverage.'"

*Title Indus. Assurance Co., R.R.G. v. First Am. Title Ins. Co.*, 853 F.3d 876, 883 (7th Cir.

2017)(internal quotation marks and internal citations omitted).

> In conducting its review, the court liberally construes the underlying complaint
> and the insurance policy in the manner reasonably most favorable to the insured.
> The court gives little weight to the legal labels attached to the underlying
> allegations. … The rule of Illinois law most important … is that if the underlying
> complaint alleges several theories of recovery, the insurer's duty to defend arises
> even if only one such theory is within the potential coverage of the policy.

*Id.* (internal quotation marks and internal citations omitted).

Additionally, where the insurance company seeks a declaratory judgment regarding its

duty to indemnify, in making the determination, the court is not limited to the four corners of the

complaint, or in this case, the statements of claim made in the Project Arbitration. *See Landmark*

*Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824–25 (7th Cir. 2016)("[W]hen an insurer has elected to

either defend under a reservation of rights or file a declaratory judgment action, ... the insurer

may present evidence beyond the underlying complaint, so long as it does not tend to determine

an ultimate issue in the underlying proceeding.").

Massachusetts and Illinois law each construe the duty to defend liberally and hold that if

there is any allegation in the applicable substantive pleading that can be reasonably susceptible

of being interpreted as being a claim covered by the applicable insurance policy, then the insurer

has a duty to defend.   Moreover, where the insurer seeks a declaratory judgment that it has no

duty to defend, both states' courts permit the court to consider facts outside the four corners of

the applicable pleading, that is, facts known to the insurer. Because I find that there is no conflict

between Massachusetts and Illinois law, I will apply Massachusetts law in determining the duty to defend.

### *Determining Coverage*

Massachusetts law provides that interpretation of an insurance policy is a question of law for the court. The court applies general rules of contract interpretation, and looks first to the actual policy language, which is "'given its plain and ordinary meaning.'" *Valley Forge Ins. Co. v. Field,* 670 F.3d 93, 2012 (1st Cir. 2012). Like all contracts, an insurance policy is to be construed according to the fair and reasonable meaning of its words. Exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured. *See Vappi & Co.,* 348 Mass. at 431-432, 204 N.E.2d at 276 (1965).   Where "the relevant policy provisions are plainly expressed, those provisions must be enforced according to their terms and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered." *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 11 (1st Cir. 2012)(internal citation omitted).

Under Illinois law, when interpreting an insurance policy, terms are given their plain and ordinary meanings. … Courts must also, of course, enforce valid limitations on coverage based on their plain meanings." *Gray,* 283 N.E.2d at 263–64. *TKK USA, Inc. v. Safety Nat. Cas. Corp.*, 727 F.3d 782, 788 (7th Cir. 2013). "[T]he interpretation of an insurance policy is a question of law that can be properly decided via summary judgment. An insurance policy is ultimately a contract, and the general rules about contract interpretation apply when a court interprets an insurance policy. Any interpretation by the Court must attempt to give effect to the parties' intentions as expressed by the policy, giving 'due regard to the risk undertaken, the subject

matter that is insured, and the purposes of the entire contract.' Unambiguous language will be construed according to its plain meaning, unless doing so would contravene public policy." *Metro. Cas. Ins. Co. v. Donnelly*, 158 F.Supp.3d 734, 737 (S.D. Ill. 2016)(internal citations and citation to quoted cases omitted). "Where ambiguity ... exist[s], the policy will be construed strictly against the insurer, who drafted the policy." *Schuchman v. State Auto Prop. & Cas. Ins. Co.*, 733 F.3d 231, 240 (7th Cir. 2013). It is the insured's burden to demonstrate that a claim is covered under the policy. The insurer then has the burden to prove that an exclusion applies. If the insurer meets its burden, the insured must then prove an exception to the exclusion. *Metro. Cas. Ins. Co.*, 158 F.Supp.3d at 738.

While Massachusetts and Illinois apply similar standards when interpreting insurance contracts, the parties disagree as to whether Massachusetts and Illinois law would reach the same result regarding relevant coverage questions. Phoenix asserts that Massachusetts and Illinois law are the same on coverage issues in all material respects.   Logistics, however, argues that while the two states laws are the same for determining whether the claim constitute an "occurrence" within the meaning of the Phoenix Policies, Massachusetts and Illinois law differ as application of the "business risk exclusion."

Under Illinois law, "liability policies are not intended to provide protection against an insured's own faulty workmanship or product, which are normal risks associated with the conduct of the insured's business. Rather, the policies are meant to afford coverage for damage to other property caused by the insured's work or product."   *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 82, 578 N.E.2d 926, 934 (1991). Thus, under the business risk exclusions, coverage is precluded where there is no damage to "other persons or property."

Under Massachusetts law, business risk exclusions "bar coverage as to any damages to the project itself caused by [the insured]'s faulty workmanship" *Acadia Ins. Co. v. Peerless Ins. Co.*, 679 F. Supp. 2d 229, 242 (D. Mass. 2010)(citation to quoted case omitted). Logistics, citing *B &T Masonry Const. Co. v. Pub.Serv.Mut.Ins.Co.*, 382 F.3d 36, 39 (1st Cir. 2004) asserts that under Massachusetts law, the exclusion applies where the insured's work damages any part of the project. As made clear in *Acadia*, this is an incomplete reading of the court's finding—the exclusion applies only where the insured's work damages any part of the project *it worked on*. When applying business risk exclusions, Massachusetts law does not bar coverage where the insured does damage to property on the project it did not work on, or to any other unrelated property, *i.e.*, property such as structures or the like outside the project. *Id.* Contrary to Logistics, I find that Massachusetts and Illinois law is substantially the same regarding application of business exclusions, and therefore there is no conflict. Accordingly, under Massachusetts choice of law rules, Massachusetts law applies.[5]

<u>Whether Phoenix has an obligation to Defend Ragnar in the CSX Arbitration</u>

*<u>The Underlying Claims</u>*

Ragnar seeks partial summary judgment on its counterclaim for a declaratory judgement that Phoenix is obligated under the Phoenix Policies to defend it in the CSX Arbitration as an "additional insured" under the Phoenix Policies (which Phoenix issued to Logistics).   More

---

[5] If there was conflict between the states' laws, then applying choice of law principles, Massachusetts, which gives great weight to the insurance contract and the circumstances of its issuance, would likely apply Illinois law. More specifically, Massachusetts courts look to: the location of the insured, which in this case would be Chicago, Illinois; the place of negotiation, where the policies were issued and payment of the premiums-- the Phoenix Policies were negotiated with Logistics in Illinois and Phoenix in Connecticut, issued by Phoenix to Logistics in Illinois; and Logistics paid the premiums. As to the location of the insured risk-- under the Phoenix Policies the insured risk is nationwide-- while this favors neither Illinois or Massachusetts, under Massachusetts law, some weight would instead be given to Logistics' place of domicile, Illinois.

specifically, Ragnar argues that Phoenix is obligated to defend because the arbitration pleadings establish that CSX is seeking to recover for damages to parts of work that were beyond Logistics' scope, and for damage to its equipment, which constitutes "property damage" within the Phoenix Policies' coverage and is not excluded. In the alternative, Ragnar contends that Logistics is contractually obligated to defend it in the Project Arbitration, and its contractual obligation qualifies for "insured contract" coverage under the Phoenix Policies. In its cross-motion for summary judgment, Phoenix asserts that as a matter of law, the Phoenix Policies afford neither defense, nor indemnity, coverage for the potential liabilities that the CSX Arbitration presents for Ragnar and therefore, it is entitled to summary judgment on the parties' respective declaratory judgment claims. Logistics seeks partial summary judgment in its favor as to Phoenix's claim seeking a declaratory judgment that it does not have a duty to defend Logistics in the Project Arbitration.

While the question of whether Phoenix must indemnify Ragnar and/or Logistics under the Phoenix Policies if they are found liable to CSX will inform the Court's decision as to whether Phoenix has a duty to defend them in the Project Arbitration, the latter question is the only issue before the Court at this time. To answer this question, I must first define the scope of the claims raised in the Project Arbitration. CSX has alleged that by 2014, the pavement placed by Logistics was already showing signs of structural deficiencies, including premature cracking and shattering of the concrete slabs. A detailed description of the alleged deficiencies and problems is set forth in the Fact section above. For purposes of this discussion, I will highlight the following allegations in CSX's arbitration Statement of Claim: premature deterioration caused by RCC's failure to appropriately design the RCC structure: failure to ensure that

bonding was achieved in the areas of multi-lift placement; failure to ensure sufficient density was achieved in the RCC placement; failing to ensure that the correct materials mixture was used in the consistently in the RCC; and failing to ensure the RCC structure was construed in accordance with Project plans/specifications and/or inappropriately approving deviations from the Project plans/specifications. CSX alleged that Ragnar's failures resulted in deterioration to the craneways and water intrusion, which would result in continuing damage to the underlying subgrade and subphase requiring extensive repairs and could potentially damage cranes and other equipment.  CSX further alleges that repairing the deficient RCC will cost more than $14,000,000. In addition, CSX will incur damages due to the impact on terminal operations. While CSX's Statement of Claim does not mention that any cranes or other "equipment" had sustained damage as of the time of filing, Phoenix has since been notified that CSX is claiming actual damage to its equipment caused by the cranes having to traverse defective concrete.

Ragnar's Statement of Claim filed in its arbitration case against Logistics asserts the following: On March 16, 2012, Ragnar entered into a subcontract agreement (previously defined herein as the "Subcontract") with Logistics to perform paving work on the Project. As to the work on the Project, the Subcontract provided that: Logistics was responsible for the means and methods of performing the RCC pavement work on the Project; Logistics' scope of work included the mix design for the RCC, production and placement of the RCC; and specifically required that Logistics meet the Prime Contract requirements and specifications for the RCC paving work. As to indemnification and insurance, the Subcontract: contained a flow down provision which makes Logistics responsible to Ragnar to the same extent that Ragnar is responsible to CSX; provides that Logistics is responsible for all cost and expense for the work

necessary to meet the requirements, including all fixes; provides that Logistics is accountable for

any errors and omissions in the performance of the Subcontract Work; provides that Logistics is

obligated to defend and indemnify Ragnar from any claim for property damage arising out of

Logistics' work; required Logistics to provide insurance to Ragnar as an additional insured,

including both commercial general liability and professional liability; required Logistics to

correct deficient work that is discovered within the warranty period; and makes clear that

Logistics is responsible for the costs to correct its deficient work and is responsible for derivative

damages for work of other contractors and all expense incurred by Ragnar caused by the non-

conforming work, including attorney's fees and costs based upon the indemnity provision

contained therein. Ragnar further asserts that CSX's claim alleges three sets of defects

implicating Logistics' RCC paving work: (1) surface cracking of the craneways; (2) "potholing"

on the RCC surfaces; and, (3) construction joint raveling. These alleged defects are attributed by

CSX to poor workmanship on the RCC paving work due to improper RCC mix design, improper

compaction, improper bonding of multi-lifts, and improper connection of vertical joints. Ragnar

alleges that all these defects fall within Logistics' scope of RCC paving work on the Project.

Ragnar also provides a detailed analysis of how Logistics failed to comply with its obligations

under the Subcontract by providing substandard work which did not meet the contractual

specifications.   Ragnar further states that CSX also alleges that the sub-base, which was work

performed by another contractor, must be removed and replaced in both the craneways and truck

travel lanes, as the sub-base has been damaged and is unstable due to the water infiltration

caused by cracking and joint deterioration. Ragnar notes that the sub-base is not within

Logistics' scope of work. Ragnar has also "supplemented" its Statement of Claim by asserting

that CSX is seeking to recover for damage to its equipment—specifically, one ore more cranes that have been damaged.

### Whether the Claims are Reasonably Susceptible to Coverage under the Phoenix Policies

Ragnar and Logistics assert that Phoenix has a duty to defend them in the Project Arbitration because one or more of the claims seek damages in a "suit" because of "property damage" as the result of an "occurrence" under the Phoenix Policies. There is no dispute that the Project Arbitration is a "suit" for purposes of the Phoenix Policies. Phoenix argues, however, that is has no duty to defend Ragnar or Logistics because none of the claims seek damages due to "property damage" as the result of an "occurrence" and in any event, the applicable business risk exclusions bar coverage.[6]

Under the Phoenix Policies, Phoenix is obligated to pay for "property damage" cause by an "occurrence" during the policy period.   The Phoenix Policies define "property damage" to mean:

a.   [p]hysical injury to tangible property, including all resulting loss of use of that property.   All such loss of use shall be deemed to occur at the time of the physical injury that caused it.

b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

"Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

---

[6] In determining whether there is coverage for an additional insured under a policy, the court looks to whether there is coverage for the insured. For purposes of the instant proceedings, Phoenix has assumed that Ragnar is an additional insured under the Phoenix Policies—a good assumption.

Ragnar argues that the claims allege that Logistics "faulty work" damaged other parts of the Project, specifically the sub-base, which was beyond the scope of Logistics' work. Moreover, CSX crane have been damaged by being operated over the uneven and pitted concrete which was the result of Logistics' faulty workmanship.   Logistics makes the same arguments in support of its motion for partial summary judgment, *i.e.*, CSX alleges that the sub-base, which Logistics did not install, has been damaged by Logistics' RCC work and that its cranes have also been damaged.

Phoenix asserts that it has no duty to defend Ragnar as an additional insured, or Logistics as an insured, because none of the allegations CSX makes in its claim allege any potential liability for which there would be coverage under the Phoenix Policies. More specifically, Phoenix asserts that CSX has not alleged that Ragnar is liable to it for "property damage" caused by an "occurrence," which Phoenix defines as an "accident." Instead, Phoenix assets that CSX is seeking damages from Ragnar for work done by Logistics, Ragnar's subcontractor, which is not covered by the Phoenix Policies. Ragnar is likewise, according to Phoenix, seeking damages from Logistics for damages not covered by the Phoenix Policies. Instead, according to Phoenix, CSX is seeking to recover from Ragnar "for damage to [Ragnar's] work- *i.e.*, damage to the work comprising the project that it contracted to perform for [CSX]—caused by construction defects in that work." Essentially, Phoenix is arguing that the business risk exclusions apply*, i.e.*, "property damage" caused by an "occurrence" does not include faulty construction workmanship which is a natural and ordinary consequence of improper construction techniques on the work which the party causing the damage *has been contracted to perform*. Moreover, Phoenix asserts that given that CSX is alleging that the work which Ragnar was hired to perform was completed

in a substandard manner, it is irrelevant whether Ragnar or its subcontractor (Phoenix's insured, Logistics) was responsible for the faulty work—the business risk exclusions bar coverage for both. As to the alleged damage to CSX equipment, Phoenix points out that while CSX asserts in its Statement of Claim that the faulty workmanship could cause damage to its cranes, it does not allege that as of the time of filing, any cranes had been damaged and CSX does not seek reparations for damage to equipment. For the reasons set forth below, I agree with Ragnar and Logistics that CSX's and Ragnar's Statements of Claim contain factual allegations which make their claims reasonably susceptible to coverage or potential coverage under the Phoenix Policies and therefore, Phoenix has a duty to defend them in the Project Arbitration.

CSX alleges that Logistics' RCC work was substandard resulting in uneven pavement, pitted pavement and water intrusion which will, among other issues, result in the deterioration of concrete and related surfaces and damage its equipment. While at the time it filed its Statement of Claim CSX, inexplicably, did not assert that equipment had been damaged, it made clear throughout its claim that the faulty workmanship was likely to result in damage to its cranes and other equipment—that is, the Statement of Claim makes clear that CSX is alleging a claim for potential coverage under the Phoenix Policies because the defects in the RCC present a substantial risk of damage to its equipment. The duty to defend is broad enough to encompass claims for potential coverage. Additionally, Phoenix has been made aware, through extrinsic evidence, that CSX is claiming actual damage to its equipment. Even if the notice was somewhat late, it was not fatally untimely. Moreover, CSX alleges that Logistics' work has damaged other areas of the Project which it (Logistics) was not responsible for, *i.e.*, the sub-base. While the vast majority of CSX's allegations are excluded from coverage because the assert that

Ragnar/Logistics failed to properly compete the work for which they were hired in accordance with plans and specifications, that CSX has alleged that the faulty work resulted in damage to work performed by another contractors on the Project and to CSX equipment is sufficient for the Court to find that at least one or more claims are reasonably susceptible to coverage under the Phoenix Policies and are not excluded. Under the circumstances, I find that CSX is alleging damages which arise for "property damage" caused by an "occurrence" within the meaning of the Phoenix Policies.[7]   Therefore, Phoenix's duty to defend Ragnar and Logistics has been triggered.[8]

## Conclusion

It is hereby Ordered that:

1. Motion for Partial Summary Judgment of Ragnar Benson Construction, LLC and Request For Hearing (Docket No. 21) is ***granted***;

2. Plaintiff's Cross Motion For Summary Judgment Against Ragnar Benson Construction LLC (Motion 35) is ***denied***; and

3.  Motion for Partial Summary Judgement of Logistics Concrete, LLC (Docket No. 55) is ***granted***.

 /s/ Timothy S. Hillman
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**

---

[7] While I ultimately concluded that Massachusetts law applies, I find that the result would also be the same applying Illinois law.

[8] Since I find that Phoenix has a duty to defend based on the theory that there is potential coverage under the Phoenix Policies for "property damage" due to an "occurrence," I need not address whether the duty to defend is triggered by Logistics' agreement to indemnify Ragnar as an "Insured Contract" under the Phoenix Policies.